IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Sunrise Cooperative, Inc.,                          Case No. 3:16CV1297

       Plaintiff

       v.                                         **ORDER**

United States Department of Agriculture, et al.,

       Defendants

      This declaratory judgment action under 28 U.S.C. § 2201 concerns a farming cooperative's right to issue "patronage rebates" to those of its members who buy crop insurance from an insurer that the cooperative partly owns.

      The plaintiff, Sunrise Cooperative, Inc. (Sunrise), is an Ohio agricultural cooperative whose members are Ohio and Michigan farmers. Sunrise owns a one-third stake in Lund and Smith Insurance Services, LLC (L&S). Sunrise declares and pays "patronage" to its members based on how much crop insurance each member buys from L&S. This "patronage" is essentially a rebate on a policy premium that creates an incentive for the cooperative's members to buy insurance from L&S.

      Since 2008, federal law has prohibited this kind of premium rebating. 7 U.S.C. § 1508(a)(9)(A). But Sunrise has continued to declare patronage under the statute's "grandfather clause," which allows an "entity" that, before enactment of the 2008 legislation, "was approved by the [Federal Crop Insurance] Corporation to make such payments for the 2005, 2006, or 2007

reinsurance year." 7 U.S.C. § 1508(a)(9)(B)(iii)(I). Having been so approved for those years, Sunrise could continue making such payments after the 2008 law took effect.

In 2016, Sunrise merged with another farming cooperative, Trupointe Cooperative, Inc. (Trupointe) and more than doubled its membership.[1] After the merger, Sunrise was the surviving corporation.

When Sunrise inquired of the United States Department of Agriculture's Risk Management Agency (RMA) whether it could, post-merger, continue making premium rebates, the RMA advised Sunrise that it could not. The agency explained that, as a result of its merger with a non-grandfathered entity like Trupointe, Sunrise was no longer an "entity that was approved" to declare patronage.

Having unsuccessfully contested the RMA's position administratively, Sunrise brought this challenge to the agency's decision under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq*.

Jurisdiction is proper under 28 U.S.C. § 1331.

Pending are the parties' counter-motions for summary judgment. (Docs. 13, 16). For the following reasons, I grant the defendants' motion and deny Sunrise's motion.

## Background

The RMA is the principal federal regulator of the crop-insurance market. It oversees a public-private partnership with "approved insurance providers" (AIPs) who sell and service crop-insurance policies in accordance with RMA guidelines. *See* 7 U.S.C. §§ 1502, 1503, 1508(k).

---

[1] Under the terms of the merger, the 4,100 members of Trupointe became members of Sunrise. After the merger, Sunrise had about 7,300 members. (Doc. 12–2 at 2).

The agency also determines the cost of crop-insurance policy premiums. 7 U.S.C. § 1508(d). It does so, in part, because federal funds subsidize the operational and administrative costs that the AIPs incur. 7 U.S.C. § 1516. Given this financial stake in the crop-insurance market, the RMA professes "an interest in ensuring that . . . the crop insurance market is operating efficiently and effectively to protect and strengthen the economic stability of America's agricultural producers, i.e., its farmers." (Doc. 16 at 9) (citing Doc. 12–3 at 37–38).

## A. Premium Rebating

Before 2000, the RMA prohibited AIPs from paying premium rebates, dividends, and patronage refunds; it did so because, in its view, such payments "may have an adverse effect on [the agency's] ability to devise and establish an effective and efficient crop insurance marketplace." (Doc. 12–2 at 25).

Congress altered the no-rebate rule in the Agricultural Risk Protection Act of 2000, 114 Stat. 358, which permitted a limited form of rebating:

> (B) Payment on Behalf of Producers.
>
> (i) Payment Authorized — If state law permits a licensing fee or other payment to be paid by an insurance provider to a cooperative association or trade association and rebated to a producer with catastrophic risk protection or additional coverage, a cooperative association or trade association located in that State may pay, on behalf of a member of the association in that State or a contiguous State who consents to be insured under such an arrangement, all or a portion of the administrative fee required by this paragraph for catastrophic risk protection.

7 U.S.C. § 1508(b)(5)(B).

Under the RMA's interpretation of this provision, an AIP could pay a licensing fee to a cooperative, and the cooperative could use that fee to pay patronage. (Doc. 12–2 at 26–27).

3

After this change in the law, some cooperatives – including Sunrise – purchased interests in crop-insurance agencies. In 2005, 2006, and 2007, the RMA approved Sunrise's arrangement with L&S's parent company and permitted Sunrise to pay premium rebates to its members. (Doc. 12–3 at 27–28).

Responding to reports of premium-rebating abuses, Congress in 2008 changed course, enacting legislation that sought to, and did, end rebate payments by nearly all cooperatives. Its only deviation from this change in direction – at issue in this case – was the grandfather clause. That provision permitted Sunrise and other entities whom the RMA had previously approved to pay patronage to continue doing so:

> (9) Premium adjustments
>
> (A) Prohibition
>
> Except as provided in subparagraph (B), no person shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, either as an inducement to procure insurance or after insurance has been procured, any rebate, discount, abatement, credit, or reduction of the premium named in an insurance policy or any other valuable consideration or inducement not specified in the policy.
>
> (B) Exceptions
>
> Subparagraph (A) does not apply with respect to —
>
> \* \* \*
>
> (iii) a patronage dividend, or similar payment, that is paid
>
> (I) by an entity that was approved by the Corporation to make such payments for the 2005,

>  > 2006, or 2007 reinsurance year, in accordance with subsection (b)(5)(B) as in effect on the day before the date of enactment of this paragraph; and
>
> (II) in a manner consistent with the payment plan approved in accordance with that subsection for the entity by the Corporation for the applicable reinsurance year.

7 U.S.C. § 1508(a)(9).

The purpose of § 1508(a)(9)(B)(iii) was, according to the bill's managers, to "'grandfather in' entities that have previously been approved by the Federal Crop Insurance Corporation to make payments in accordance with subsection (b)(5)(B) as in effect on the day before the date of enactment." Conference Report on H.R. 2419, Food, Conservation, and Energy Act of 2008, 2008 WL 2038610, *H3659. The managers also emphasized that the exception was a limited one:

> The Managers expect the Corporation to exercise strict oversight to ensure that these entities are operating consistent with federal and state law and the payment plan submitted and approved. The Managers understand through discussions with RMA that the parties covered by the grandfather clause represent the universe of parties engaged in this activity. The Managers also understand from RMA that, while two of the submissions are still under review, no further requests are pending or expected from additional parties seeking to engage in the activities of those parties covered by the grandfather clause.

*Id.*

## B. Administrative Proceedings

In November, 2015, before the merger of Sunrise and Trupointe, the RMA asked Sunrise to submit a formal inquiry as to whether, post-merger, it would be eligible to issue patronage under § 1508(a)(9)(B)(iii). (Doc. 12–2 at 21).

In its responsive submission, Sunrise asserted that it would still qualify for the exception because in its post-merger form, it would be the same "entity" that the RMA had approved to pay patronage during the 2005-07 period. This was so, Sunrise maintained, because both Ohio corporate law and federal tax law would deem the post-merger Sunrise to be the same legal entity as the pre-merger Sunrise. (*Id.* at 2–4).

After considering that submission, the RMA in February, 2016, notified Sunrise that its merger with Trupointe would render it ineligible to pay patronage.

The agency explained that it interpreted § 1508(a)(9)(B) to mean that "any substantive change in the cooperative association, including any mergers or acquisitions, means that the cooperative association is no longer considered to have been approved by RMA to make [premium-rebate] payments for the 2005–2007 reinsurance years." (*Id.* at 12).

According to the RMA, it was incumbent on it to interpret the grandfather clause in light of the congressional desire to stop the growth in premium-rebating:

> Section 508(a)(9)(B) creates a very narrow exception to a very broad prohibition. It is very clear that Congress did not want to allow the payment of patronage dividends through any cooperative association that was not previously approved or it would not have revised section 508(b)(5)(B) of the FCIA to eliminate the authority for cooperatives to pay patronage dividends. Therefore, RMA narrowly construes the exception provided in section 508(a)(9)(B) of the FCIA to include only those cooperative associations approved for the stated years with the same entity structure. To interpret the provision in any other manner could render the prohibition meaningless because approved cooperatives could merge with any number of other

6

cooperatives, while keeping the original name of the approved marketplace, and effectively disrupting the marketplace, the very outcome Congress sought to eliminate.

(*Id.*).

Sunrise disputed that construction of § 1508(a)(9)(B)(iii) in a March, 2016, letter to the RMA. According to Sunrise, nothing in the statute's plain language prohibited a grandfathered cooperative that merged with a non-grandfathered cooperative from paying patronage under the grandfather clause. (*Id.* at 12–17).

In May, 2016, the RMA issued its final decision denying Sunrise the benefit of the grandfathering exemption. Taking the position that the statutory term "entity" was ambiguous because it was undefined, the RMA interpreted the term narrowly as referring to an entity "with the same structure and relative size":

> [Sunrise] acknowledge[s] that the term "entity" is not defined in the FCIA and, therefore, is ambiguous. The Supreme Court has consistently held that when a statutory term is ambiguous or undefined, the court construing the statute should defer to the reasonable interpretation of the term proffered by the agency administering the statute.
>
> \* \* \*
>
> As stated previously in the February 1, 2016, letter on this subject, given the context of enactment of section 508(b)(9)(B), which Congress intended as a prohibition against paying patronage dividends except for those cooperatives previously approved by RMA, RMA construed the term "entity" narrowly to limit it to the cooperative as it existed when section 508(a)(9)(B) was enacted . . . RMA's interpretation is reasonable given that Congress limited the exception to the cooperatives that were approved for these specific years. At the time, there were only a few small cooperatives that had been approved by the RMA during the applicable reinsurance years.
>
> \* \* \*

> Therefore, for the purposes of section 508(a)(9)(B), RMA interprets "entity" to mean the same entity that it approved for any of the 2005–07 reinsurance years, with the same structure and relative size and any mergers, sales, acquisitions, etc. will be considered a different entity, regardless of what it is named or how it is taxed.

(*Id.* at 18–20).

Notwithstanding the RMA's determination, Sunrise merged with Trupointe in September, 2016. (Doc. 1 at ¶17). Thereafter, Sunrise filed this action against the United States Department of Agriculture, the Federal Crop Insurance Corporation, and the RMA. Sunrise seeks a declaration that its merger with Trupointe has no effect on its ability under the grandfather clause to pay patronage.

**Standard of Review**

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**Discussion**

The issue in this case is whether, after its merger with a non-grandfathered cooperative, Sunrise is still "an entity that was approved by the Corporation to make [premium-rebate] payments for the 2005, 2006, or 2007 reinsurance years," 7 U.S.C. § 1508(a)(9)(B)(iii)(I).

According to Sunrise, the term "entity" in § 1508 has its "plain and ordinary meaning": an organization, like a business or governmental unit, that has a legal identity apart from its members. (Doc. 13 at 7) (citing *Black's Law Dictionary* (2004)).

The government defendants respond that the RMA's decision that Sunrise was no longer a grandfathered "entity" was "consistent with the plain language of the statute[.]" (Doc. 16 at 19).

They also argues that, despite any statutory ambiguity, the RMA reasonably decided that Sunrise was no longer a qualified entity because: 1) the purpose of the 2008 statute was to eliminate premium-rebating among all but a specific handful of agricultural cooperatives; and 2) permitting a grandfathered cooperative that merges with a non-grandfathered cooperative to continue paying patronage would be inconsistent with the desire of Congress to stop the spread of premium-rebating.

**A. The *Chevron* Analysis**

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 842 (1984).

"First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.

9

"If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

### B. Section 1508(a)(9)(B) Does Not Speak Directly to the Question Presented

Under the *Chevron* analysis, the first question is whether § 1508(a)(9)(B) speaks directly to whether a grandfathered cooperative is, after its merger with a non-grandfathered cooperative, "an entity that was approved by the Corporation to make [premium-rebate] payments for the 2005, 2006, or 2007 reinsurance year[.]"

Sunrise says the answer is "yes" because the statute is concerned only with a cooperative's formal, legal identity. (Doc. 13 at 6–8)).

Its merger with Trupointe, it contends, did not, under Ohio corporate and federal tax law, alter that identity. (*Id.* at 7). The term "entity" in § 1508(a)(9)(B) must, in its view, necessarily draw its meaning from state corporate and federal tax law, both of which treat Sunrise, as the entity that survived the merger, as having the same legal identity it had before the merger. The RMA therefore erred, Sunrise contends, in failing to give the term "entity" its conventional legal meaning.

The defendants argue that Sunrise ignores the context in which the grandfather clause exists – namely, that § 1508(a)(9)(B) creates a limited exception to an otherwise all-encompassing prohibition of premium rebating. Thus, the defendants argue, the RMA properly interpreted the

interaction between the broad prohibition and narrow exception. The agency's interpretation of the term "entity" best conforms, the defendants maintain, to the overall intent of Congress in 2008.

Both of these interpretations are plausible ways of understanding what Congress meant by an "entity that was approved" to pay patronage. Sunrise relies on form: namely, the technical, limited definition of Ohio corporate and federal tax law. The government defendants, in contrast, point to the substance, the reality of post-merger Sunrise: it now comprises, in a practical sense, the members of one grandfathered entity and the members of one non-grandfathered entity – and the attendant increase in premium-rebating that comes with the expanded membership.

I conclude, therefore, that in § 1508(a)(9)(B) Congress simply has not "directly spoken to the precise question at issue" in this case, and the statutory provision at issue is ambiguous. *Chickasaw Nation v. U.S.*, 534 U.S. 84, 90 (2001) (a statute is ambiguous if it is "capable of being understood in two or more possible senses or ways"). Accordingly, I turn to whether the RMA's construction of the statute is reasonable.

### C. The RMA Reasonably Determined That Sunrise Was No Longer "An Entity That Was Approved" to Pay Patronage

"If the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer the court would have reached if the question initially had arisen in a judicial proceeding." *Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998) (internal quotation marks omitted).

In construing the grandfather clause narrowly, the RMA emphasized that Congress, responding to abuses during the brief period in which rebates were permissible, enacted a broad prohibition on the practice. (Doc. 12–2 at 19).

The RMA also observed that, at the time Congress authorized the grandfather clause, "there were only a few small cooperatives that had been approved by RMA during the applicable reinsurance years." (*Id.*).

Finally, the RMA explained that Sunrise's proposed interpretation would thwart the purpose of the ban on premium-rebating by allowing non-grandfathered cooperatives – *via* the expedient of merging with grandfathered cooperatives – to engage in premium-rebating. (*Id.* at 19–20) ("Your interpretation would effectively render this small limited exception meaningless because it would allow any prior approved cooperative to merge with other cooperatives that were not approved to pay the patronage dividends to allow producers who were not previously eligible to receive a patronage dividend now to receive one, circumventing the prohibition.").

I conclude that this was a most reasonable construction of the statute.

As the defendants emphasize, the grandfather clause in § 1508 is a modest exception to broad and generally applicable prohibition. It is entirely appropriate for the agency to construe such a provision narrowly and against parties seeking to benefit from them in derogation of a statute's manifest purpose. *See SoundExchange, Inc. v. Muzak LLC*, 854 F.3d 713, 719 (D.C. Cir. 2017) ("grandfather clauses that operate in derogation of a statute's dominant purpose should be narrowly construed"); *N.L.R.B. v. Dole Fresh Vegetables, Inc.*, 334 F.3d 478, 485 (6th Cir. 2003) (same).

By enacting the 2008 statute, moreover, Congress all but abolished the practice of premium-rebating. It left the practice intact in the grandfather clause, but as the RMA noted, only a handful of cooperatives were eligible to continue premium-rebating after the 2008 law took effect. The RMA's construction – unlike Sunrise's construction – is consistent with Congress's intent, as it

prohibits large, abrupt increases in the amount of premium-rebating that can occur when, as in this case, a non-grandfathered entity merges with a grandfathered entity.

### D. Sunrise's Counter-Arguments Lack Merit

Sunrise offers two counter-arguments: 1) the RMA's interpretation precludes otherwise natural changes in a grandfathered cooperative's membership; and 2) the RMA's decision in this case is inconsistent with its decision in another, similar case. Neither has merit.

### 1. The RMA's Interpretation Permits
### Natural Changes in a Cooperative's Membership

First, Sunrise argues that the RMA's interpretation is unreasonable because, given the agency's focus on changes in membership size, "it would be conceivable . . . that once a grandfathered entity lost or gained a single member, it would not be the same entity that was [originally] grandfathered[.]" (Doc. 17 at 10).

But the RMA specifically rejected that interpretation in its correspondence with Sunrise:

> RMA acknowledges that any business may gain and lose customers every year. However, mergers, sales, and acquisitions go far beyond this customary change in customer base and effectively allows an unlimited number of producers to receive patronage dividends for the first time in the 2016 reinsurance year when the exception is limited to those producers who were approved to receive patronage dividends in the 2005–2007 reinsurance years. Therefore, for the purposes of section 508(a)(5)(9), RMA interprets "entity" to mean the same entity that it approved for any of the 2005–07 reinsurance years, with the same structure and relative size and any mergers, sales, acquisitions, etc. will be considered a different entity, regardless of what it is named or how it is taxed.

(Doc. 12–2 at 22).

Accordingly, the RMA has set forth a reasoned interpretation under which it accepts that a grandfathered cooperative may experience natural growth in its membership and retain its qualified

13

status, but rejects immediate, wholesale acquisition of new members through mergers, acquisitions, and the like.

Simply put, Sunrise could have gained strength naturally and continued its patronage program, but it could not "bulk up" by swallowing otherwise freestanding cooperatives and continue to enjoy the protection of the grandfather clause.

### 2. No Evidence Supports Sunrise's Arbitrary-and-Capricious Argument

Sunrise also argues that the RMA has permitted other grandfathered cooperatives to pay patronage after merging with non-grandfathered cooperatives. (Doc. 17 at 4–7).

According to Sunrise, two grandfathered Florida cooperatives – South Florida Federal Land Bank Association and Farm Credit of Southwest Florida ACA – merged with a non-grandfathered cooperative – Farm Credit of North Florida – in 2011. (*Id.* at 4–5). This shows, in Sunrise's view, that the RMA exercises its authority under the grandfather clause in an arbitrary and capricious manner.

As the defendants respond, however, there are several defects in Sunrise's argument.

First, it is undisputed that Sunrise never presented the evidence on which this argument rests – printouts from various websites and a newspaper article recounting the merger of the three Florida cooperatives – to the RMA. Although it is possible to supplement the administrative record in certain circumstances, *e.g.*, *Univ. of Colorado Health at Mem. Hosp. v. Burwell*, 151 F. Supp. 3d 1 (D.D.C. 2015), Sunrise has not demonstrated that it is appropriate to do so here.

Second, even if I were to supplement the record with these materials, they would not be admissible under the Federal Rules of Evidence.

Sunrise contends that I can take judicial notice of the materials under Rule 201 because the information they contain comes from sources "whose accuracy cannot reasonably be questioned." But while it may be appropriate to take judicial notice of the fact that a website or newspaper published something, it is inappropriate to take judicial notice of the truth of the matters asserted within the publication. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008); *Jergens v. Ohio Dep't of Rehab. & Corrections Adult Parole Auth.*, 492 F. App'x 567, 569 (6th Cir. 2012); *Platt v. Bd. of Commr's*, 2016 WL 5372298, *1 (S.D. Ohio).[2]

Finally, even setting aside questions of admissibility, the documents do not establish what Sunrise contends they establish.

According to the certified administrative record in this case, the two grandfathered Florida entities represented to the RMA that, after their merger, they would continue to pay patronage "under the same terms and conditions under which our organization[s] received *original approval from FCIC*." (Doc. 12–4 at 64, 67, 72, 89, 122, 142, 162) (emphasis added).

That is to say, they represented to the RMA that they were in full compliance with the grandfather clause. Nowhere in the certified record does it appear that the Florida cooperatives represented that they had merged with a non-grandfathered entity. Accordingly, Sunrise has not shown the existence of a genuine dispute of material fact as to whether the RMA knowingly allows some grandfathered cooperatives that merge with non-grandfathered cooperatives to continue engaging in premium-rebating while denying that same privilege to cooperatives like Sunrise.

---

[2] Accordingly, I will sustain the government's objection (Doc. 20) under Fed. R. Civ. P. 56(c)(2) to this evidence.

## Conclusion

The statute provides no manifestly clear answer to the question that this case raises. In looking to substance instead of form in reaching its decision, the RMA acted reasonably to effectuate and implement what Congress sought to accomplish.

It is, therefore,

ORDERED THAT:

1. Defendants' motion for summary judgment (Doc. 16) be, and the same hereby is, granted;

2. Plaintiff's motion for summary judgment (Doc. 13) be, and the same hereby is, denied;

3. Defendants' objection under Fed. R. Civ. P. 56(c)(2) (Doc. 20) be, and the same hereby is, sustained; and

4. Plaintiff's motion for an oral hearing (Doc. 18) be, and the same hereby is, denied, as the briefs and certified record provided the court with a full understanding of the factual and legal issues involved and allowed the court to render a fair and proper decision.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge